**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 18–1931**

―――――――――――

FELICIA SANDERS, individually and as Legal Custodian for K.M., a minor,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

―――――――――――

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

―――――――――――

**No. 18–1932**

―――――――――――

JENNIFER PINCKNEY, Personal Representative of the Estate of Clementa Pinckney,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

―――――――――――

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

————————

**No. 18–1933**

————————

JENNIFER PINCKNEY,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

————————

**No. 18–1935**

————————

JENNIFER PINCKNEY, individually and as Parent, Natural Guardian and Next Friend of M.P., a minor,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

**No. 18–1936**

TYRONE SANDERS, Personal Representative of the Estate of Tywanza Sanders,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

**No. 18–1937**

FELICIA SANDERS,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

---

**No. 18–1938**

---

ANTHONY THOMPSON, as Co-Personal Representative of the Estate of Myra Singleton Quarles Thompson; KEVIN SINGLETON, as Co-Personal Representative of the Estate of Myra Singleton Quarles Thompson,

Plaintiffs – Appellants,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

---

**No. 18–1939**

---

POLLY SHEPPARD,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

4

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1940**

_____

WALTER B. JACKSON, Personal Representative of the Estate of Susie Jackson,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1941**

_____

LAURA MOORE, Personal Representative of the Estate of Ethel Lance,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

5

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

---

**No. 18–1942**

---

DANIEL L. SIMMONS, JR., as Personal Representative of the Estate of Daniel L. Simmons Sr.,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

---

**No. 18–1943**

---

SHALISA COLEMAN, as Personal Representative of the Estate of Sharonda Coleman-Singleton,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1944**

_____

ANTHONY THOMPSON,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1945**

_____

ARTHUR STEPHEN HURD, as Personal Representative of the Estate of Cynthia Graham Hurd,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

7

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1946**

_____

ARTHUR STEPHEN HURD,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

_____

**No. 18–1948**

_____

BETHANE MIDDLETON-BROWN, Personal Representative of the Estate of DePayne Middleton-Doctor,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee,

_____

8

BRADY CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellant.

––––––––––––––––

Appeals from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:16–cv–02356–RMG; 2:16–cv–02350–RMG; 2:16–cv–02351–RMG; 2:16–cv–02352–RMG; 2:16–cv–02354–RMG; 2:16–cv–02355–RMG; 2:16–cv–02357–RMG; 2:16–cv–02358–RMG; 2:16–cv–02359–RMG; 2:16–cv–02360–RMG; 2:16–cv–02378–RMG; 2:16–cv–02405–RMG; 2:16–cv–02406–RMG; 2:16–cv–02407–RMG; 2:16–cv–02409–RMG; 2:16–cv–02746–RMG)

––––––––––––––––

Argued: May 7, 2019                          Decided: August 30, 2019

––––––––––––––––

Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges.

––––––––––––––––

Reversed and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Diaz joined. Judge Agee wrote a separate opinion concurring in part and dissenting in part.

––––––––––––––––

**ARGUED:** William Walter Wilkins, NEXSEN PRUET, Greenville, South Carolina, for Appellants. Thomas George Ward, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Benjamin Softness, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C. for Amicus Curiae. **ON BRIEF:** Kirsten E. Small, NEXSEN PRUET, Greenville, South Carolina, for Appellants Felicia Sanders, Jennifer Pinckney, Tyrone Sanders, Anthony Thompson, Arthur Stephen Hurd, Polly Sheppard, Walter B. Jackson, Laura Moore, Daniel L. Simmons, Jr., Shalisa Coleman, Kevin Singleton, and Bethane Middleton-Brown. Gedney M. Howe, III, Alvin J. Hammer, GEDNEY M. HOWE, III, PA, Charleston, South Carolina, for Appellants Felicia Sanders, Jennifer Pinckney, Anthony Thompson, Tyrone Sanders, Polly Sheppard, Walter B. Jackson, Laura Moore, Bethane Middleton-Brown, and Kevin Singleton. Andrew J. Savage, III, SAVAGE LAW FIRM, Charleston, South Carolina, for Appellants Felicia Sanders, Shalisa Coleman, Anthony Thompson, Tyrone Sanders, Polly Sheppard, Walter B. Jackson, Laura Moore, Kevin Singleton, and Bethane Middleton-Brown. W. Mullins McLeod, Jr., Jacqueline LaPan Edgerton, MCLEOD LAW GROUP LLC, Charleston, South Carolina, for Appellants Arthur Stephen Hurd, Anthony Thompson, and Shalisa Coleman. Carl E. Pierce, II, Joseph C. Wilson, IV, PIERCE, SLOAN, WILSON, KENNEDY & EARLY LLC, Charleston, South Carolina, for Appellant

Daniel L. Simmons, Jr. S. Randall Hood, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina; Sen. Gerald Malloy, MALLOY LAW FIRM, Hartsville, South Carolina, for Appellants Jennifer Pinckney and Anthony Thompson. J. Stephen Schmutz, Charleston, South Carolina; David F. Aylor, LAW OFFICES OF DAVID AYLOR, Charleston, South Carolina, for Appellants Anthony Thompson, Arthur Stephen Hurd and Shalisa Coleman. Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Joshua M. Salzman, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Jonathan E. Lowy, Mariel Goetz, Joshua Scharff, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C.; Scott H. Angstreich, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Amicus Curiae.

---

GREGORY, Chief Judge:

On June 17, 2015, Dylann Roof entered Mother Emanuel A.M.E. Church in Charleston, South Carolina, and opened fire, murdering nine worshipers who had gathered for Bible study: Reverend Clementa Pinckney, Reverend Sharonda Coleman-Singleton, Reverend Daniel Simmons, Reverend DePayne Middleton-Doctor, Myra Thompson, Tywanza Sanders, Ethel Lance, Cynthia Hurd, and Susie Jackson. In the weeks following this tragedy, James Comey, then the Director of the Federal Bureau of Investigation ("FBI"), issued a public statement explaining that Roof was prohibited under federal law from possessing a firearm and that he was able to purchase the Glock 41 semiautomatic pistol he used in the attacks only because of lapses in the FBI's National Instant Criminal Background Check System ("NICS"). As Director Comey stated, "Dylann Roof, the alleged killer of so many innocent people at the Emanuel AME church, should not have been allowed to purchase the gun he allegedly used that evening."[1]

These consolidated cases concern the lawsuits brought by survivors and the estates of the deceased victims ("Plaintiffs") seeking to hold the United States liable for negligently performing the Roof background check—a background check that, if performed properly, no one disputes would have prevented Roof from purchasing the firearm he used to commit this atrocity. Following jurisdictional discovery, the district court dismissed the Plaintiffs' claims for lack of subject-matter jurisdiction on two

---

[1] Press Release, FBI, Statement by FBI Director James Comey Regarding Dylann Roof Gun Purchase (July 10, 2015), https://www.fbi.gov/news/pressrel/press-releases/statement-by-fbi-director-james-comey-regarding-dylann-roof-gun-purchase ("FBI Press Release").

independent grounds. First, the district court held that the Government was immune from liability under the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a). Second, the court concluded that the Government enjoyed immunity under the Brady Act's immunity provision, 18 U.S.C. § 922(t)(6). The Plaintiffs now appeal, contending that the district court erred on both grounds.

We agree. Because neither provision affords the Government immunity in this case, we reverse the district court's order granting the Government's motion to dismiss for lack of subject-matter jurisdiction and remand for further proceedings consistent with this opinion.

## I.

### A. Statutory and Regulatory Background

### 1. The Brady Act and the National Instant Criminal Background Check System

Federal law prohibits certain individuals from buying, owning, or possessing a firearm, including anyone who has been convicted of a felony or "is an unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922(g)(1), (3). In 1993, Congress enacted the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536, to "prevent convicted felons and other persons who are barred by law from purchasing guns."[2] To achieve this objective, the Act required the Attorney General to establish a National Instant Criminal Background Check System ("NICS") that federally licensed

---

[2] H.R. Rep. No. 103-344, at 7 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1984, 1984.

firearms dealers and others must use to determine "whether receipt of a firearm by a prospective transferee would violate section 922 . . . or State law." 34 U.S.C. § 40901(b). If the background check reveals that a transfer would be illegal, the dealer cannot proceed with the transfer. *See* 18 U.S.C. § 922(t)(1).

The FBI was charged with implementing and administering the NICS, which began operating in 1998. *See generally National Instant Criminal Background Check System Regulation*, 63 Fed. Reg. 58,303 (Oct. 30, 1998). The Brady Act implementing regulations and certain Standard Operating Procedures ("SOPs") spell out the procedures the FBI follows in performing background checks. *See* 28 C.F.R. §§ 25.1–25.11. These regulations and SOPs form the heart of this appeal.

The process begins when a federally licensed firearms dealer initiates the required background check by contacting the FBI's NICS Operations Center. *Id.* § 25.6(b). On receiving this inquiry, a representative from the Operations Center must confirm the dealer's identity and assign an NICS Transaction Number ("NTN") to the inquiry. *Id.* § 25.6(c)(1)(i)–(ii). The representative then must "[s]earch the relevant databases (i.e., NICS Index, NCIC, III) for any matching records" that would prohibit the transfer of the firearm to the prospective purchaser. *Id.* § 25.6(c)(1)(iii). Each of the three databases is slightly different. The NICS Index is a database managed by the FBI "containing information provided by Federal and state agencies about persons prohibited under Federal law from receiving or possessing a firearm." *Id.* § 25.2. The National Crime Information Center ("NCIC") database is a "nationwide computerized information system of criminal justice data established by the FBI" for use by local, state, and federal agencies. *Id.* And

13

the Interstate Identification Index ("III") is "the cooperative federal-state system for the exchange of criminal history records." *Id.* § 20.3(m).

Based on the search of these databases, the NICS representative will provide one of three responses to the dealer. The representative will provide a "Proceed" response if no disqualifying information is found in any of the databases. *Id.* § 25.6(c)(1)(iv)(A). She will provide a "Denied" response if a matching record is found in one of the databases "demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law." *Id.* § 25.6(c)(1)(iv)(C). And she will provide a "Delayed" response if the search uncovers a record that "requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law." *Id.* § 25.6(c)(1)(iv)(B). Such a response means that the dealer may not proceed with a firearm transfer "pending receipt of a follow-up 'Proceed' response from the NICS or the expiration of three business days . . . whichever occurs first." *Id.* If the NICS fails to make a determination within three business days, the dealer may complete the sale and transfer the firearm. *Id.*

If a transaction receives a Delayed response, it is automatically placed in a Delayed queue and assigned to an NICS Legal Instrument Examiner. This Examiner conducts additional research in an effort to obtain complete information enabling the FBI to determine whether a prospective purchaser may lawfully purchase or possess a firearm. J.A. 409.

NICS has developed a set of SOPs that govern the research process for Delayed transactions and provide an order of operations for conducting this research. In accordance

14

with SOP 5.5.4, Examiners must first conduct internal research, consulting all internal automated systems as well as the NICS Library and a legal database (if applicable). J.A. 478. If this internal research fails to indicate whether the transaction may proceed or should be denied, the Examiner must conduct external research under SOP 5.5.5. J.A. 549. This SOP provides that the Examiner "will contact the state POC [point of contact], the courts, district attorneys, probation offices, arresting agencies, etc." for incident reports "in accordance with the preference indicated on the State Processing Page and Contact List." J.A. 549. The South Carolina Processing Page in turn indicates that "[c]ourts and arresting agencies are the primary contact (follow Contact List)," and that arresting agencies in particular are the contact for "police/incident report[s]." J.A. 491–92.

A separate component of the Brady Act regulatory scheme relevant to this case addresses data integrity. Entitled "Validation and data integrity of records in the system," this regulation provides that the FBI "will be responsible for maintaining data integrity during all NICS operations that are managed and carried out by the FBI." 28 C.F.R. § 25.5(a). This responsibility generally entails maintaining the accuracy, quality, and validity of records in the NICS Index. *See id.* § 25.5(a)(1)–(4).

### 2. The National Data Exchange (N-DEx)

A fourth database, which the NICS Examiner did not review, is also relevant to this case. After the September 11, 2001, terrorist attacks, the FBI created the National Data Exchange ("N-DEx") to provide criminal justice agencies at the federal, state, local, and tribal levels with access to a vast array of criminal justice information like incident and arrest reports, booking reports, and pretrial investigations. *See Sanders v. United States*,

15

324 F. Supp. 3d 636, 643 (D.S.C. 2018). It is undisputed that the Government decided against giving NICS Examiners access to N-DEx. *See* J.A. 1436 ("N-DEx was reviewed by the NICS Section in 2013 and was not included as a dataset . . . because the review determined a low information return rate at the time and a conflict with purging requirements.").

## B. Factual Background

On Saturday, April 11, 2015, Roof sought to purchase a semiautomatic pistol from a federally licensed firearms dealer in West Columbia, South Carolina. *Sanders*, 324 F. Supp. 3d at 644. The dealer in turn contacted NICS by telephone to determine whether the sale could proceed. *Id.* The NICS representative who fielded the inquiry searched the three databases for any information on Roof. While the NICS Index and NCIC database yielded no relevant information, the III database returned a record indicating that Roof had been arrested just six weeks earlier on a felony cocaine charge and that the arresting agency was the Lexington County Sheriff's Office. *Id.* An arrest for a drug offense may indicate that a person is an "unlawful user of or addicted to any controlled substance" and thus cannot legally possess a firearm, 18 U.S.C. § 922(g)(3), but such an arrest is not by itself disqualifying. The SOPs require proof that the substance possessed has been confirmed through testing to be a controlled substance, or that the arrestee admitted that it was a controlled substance. *Sanders*, 324 F. Supp. 3d at 645. For this reason, the transaction was placed into the Delayed queue for further research. *Id.* at 644–45. NICS informed the dealer that the sale could proceed on Thursday, April 16, 2015, unless instructed otherwise.

It later became clear that the III database entry provided by the Lexington County Sheriff's Office was inaccurate in certain crucial respects. *Id.* First, Roof had been arrested not on a felony cocaine charge but on a misdemeanor charge for simple possession of a Schedule III controlled substance (Suboxone) without a prescription. *Id.* at 644. Second, and more importantly, the record misidentified the arresting agency as the Lexington County Sheriff's Office when it was the Columbia Police Department ("Columbia PD") that had arrested Roof. *Id.* This misidentification was a product of the fact that Roof was arrested in a part of Columbia, South Carolina, that falls in Lexington County. Most of Columbia is in Richland County. The Columbia PD thus has jurisdiction over the area where Roof was arrested and indeed made the arrest, but Roof was booked at the Lexington County Sheriff's Office, which initially processes arrests occurring in that county. *Id.* at 642. This error was especially consequential because it caused NICS to believe mistakenly that the documents associated with Roof's arrest would be found with the Lexington County Sheriff's Office rather than the Columbia PD.

On Monday, April 13, the first business day following the initial NICS inquiry, an NICS Examiner pulled the transaction from the Delayed queue to conduct additional research. This NICS Examiner's "primary responsibility [was] to research transactions for Region II, which includes South Carolina." J.A. 643–44. In accordance with the SOPs, the Examiner first reviewed internal NICS databases, but she came across nothing aside from what had already been identified in the III database. *Sanders*, 324 F. Supp. 3d at 645. The Examiner then began external research. Following the directive in SOP 5.5.5 to contact the state points of contact, the courts, and arresting agencies, the Examiner,

believing that the Lexington County Sheriff's Office made the arrest, checked the online case index for the Lexington County Court. *Id.* She discovered a pending case against Roof for "Drugs / Poss. of other controlled sub. in Sched. I to V – 1st offense," a misdemeanor. *Id.* This case report did not list the Columbia PD as the arresting agency or give any more relevant details about the arrest, but it did name Officer Fitzgerald as the arresting officer and provide an address. *Id.* Officer Fitzgerald worked at Columbia PD and the address provided was that of the Columbia PD headquarters. *Id.*

Because the record of Roof's arrest alone was insufficient under NICS procedures to establish that he was disqualified from possessing a firearm, the Examiner tried on Monday afternoon to obtain a copy of the incident report underlying the arrest. Specifically, she sent faxes requesting a copy of the report to the Lexington County Sheriff's Office and the 11th Circuit Solicitor's Office, which prosecutes cases in Lexington County. *Id.* at 645–46. The Solicitor's Office never responded to this request. *Id.* at 646. The Sheriff's Office responded later in the afternoon by returning the fax with a handwritten note stating, "No arrest or report for this date. The last arrest was on 2-28-15. Columbia PD will have the Report." *Id.*

The Examiner did not follow these instructions and contact the Columbia PD, however. Instead, she reviewed the list of law enforcement agencies in the Lexington County section of the State Contact List and found the West Columbia PD. *Id.* Columbia PD appears only in the Richland County section of the list because that is where its headquarters is located. The Examiner then faxed an information request to the West Columbia PD, which returned the fax the next morning with the following handwritten

18

response: "Not WCPD Warrant[.]  This is not a WCPD Arrest."  *Id.*  Rather than attempt to contact the Columbia PD at this time, the Examiner "did nothing more," leaving the Roof inquiry in the Delayed queue and processing other inquiries while awaiting a response from the Lexington County Solicitor's Office.  *Id.*  This response never came.

On Thursday, April 16, after the three business days had elapsed, the firearms dealer went forward with the sale of the semiautomatic pistol to Roof.  *Id.*  Roof would use this weapon two months later to murder nine people at Mother Emanuel A.M.E. Church in Charleston, South Carolina.

The NICS Section eventually obtained a copy of the incident report underlying Roof's arrest.  Prepared by the Columbia PD, the report indicated that Roof admitted he was in possession of Suboxone, a Schedule III controlled substance for which he had no prescription.  *Id.* at 642.  There is no dispute that the information in this report would have been sufficient to establish that Roof was an unlawful user of a controlled substance who could not lawfully possess a firearm.  *Id.*  If the Examiner had obtained this report, then, the dealer's inquiry would have been denied, and Roof would not have been allowed legally to acquire the gun he used in his attacks.  *See* FBI Press Release ("If a[n] NICS examiner saw [the report], Roof would be denied permission to buy a gun.").

It also later became clear that both the Columbia PD and the Lexington County Sheriff's Office had submitted the Roof incident report to N-DEx before the NICS Examiner conducted research on the Roof transaction.  *Sanders*, 324 F. Supp. 3d at 642.  As we have explained, however, the NICS Examiner did not have access to the N-DEx database.

19

## C. Procedural History

In 2016, the survivors of Roof's attack and the estates of the deceased victims filed a series of lawsuits against the United States, alleging that the Government was liable under the Federal Tort Claims Act ("FTCA") for failing to prevent Roof from purchasing the firearm he used in the shooting. *See* 28 U.S.C. § 2674 (providing that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances"). The Plaintiffs in these cases principally argued that the Government negligently performed the NICS background check in violation of the Brady Act and 28 C.F.R. Part 25.

The district court consolidated the cases, and the Government moved to dismiss for lack of subject-matter jurisdiction under the FTCA and for failure to state a claim under South Carolina tort law. *Sanders*, 324 F. Supp. 3d at 639. As relevant here, the Government argued that it was immune from liability under the discretionary function exception to the FTCA, which grants immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a).

The district court generally denied the Government's motion to dismiss without prejudice and ordered the parties to engage in jurisdictional discovery concerning the applicability of the discretionary function exception.[3] *Sanders*, 324 F. Supp. 3d at 639.

---

[3] The district court denied with prejudice the Government's argument that the FTCA's misrepresentation exception shielded it from suit. *See* 28 U.S.C. § 2680(h). The Government represents on appeal that it no longer presses this argument. *See* Resp. Br. 15 n.4.

After discovery, the Government renewed its motion to dismiss, arguing again that the Plaintiffs failed to state a claim and that the discretionary function exception barred the suit. *Id.* The Government also argued—in its reply brief, and for the first time—that it was entitled to immunity under 18 U.S.C. § 922(t)(6), the provision of the Brady Act that grants immunity for any claim arising out of a failure to prevent the sale of a firearm to an ineligible person in the course of conducting an NICS background check. *Sanders*, 324 F. Supp. 3d at 639, 649.

The district court held an evidentiary hearing and allowed the parties to file additional materials in the following weeks. On June 18, 2018, the district court granted the Government's motion to dismiss on two independent grounds.

First, the court determined that the FTCA's discretionary function exception barred the Plaintiffs' claims. The court explained that the NICS SOPs "require the examiners only to send a single automated fax to a law enforcement agency with no expectation or requirement that follow up work be done if the necessary records are not obtained." *Id.* at 647. According to the court, the Examiner here complied with the SOPs when she sent the two faxes and, after learning that "Columbia PD w[ould] have the Report," contacted the West Columbia PD because "Columbia PD" appeared nowhere on the Lexington County Contact List. *Id.* The court recognized that, "[w]hen West Columbia promptly responded it was not the arresting agency, a reasonable and logical procedure would have been to follow the lead already given that the City of Columbia had the arrest record." *Id.* Nevertheless, the court concluded that the SOPs did not provide for this situation and emphasized that the Examiner was prohibited from using the internet to retrieve the

21

Columbia PD's contact information. The Examiner's decision "to do nothing" "may not have met the most minimal standards of common sense or due care, but the [E]xaminer did not violate her agency's policy." *Id.*

At bottom, the court continued, "[t]he fault here lies in some abysmally poor policy choices made regarding the operation of the NICS," most notably the decision to deny NICS Examiners access to N-DEx, which contained the Roof incident report. *Id.* And yet "the FTCA provides the Government immunity for policy choices (even really bad policy choices) under the discretionary function exception." *Id.*; *see also id.* at 649 (stating that "[t]he glaring weaknesses revealed in the background check system . . . are the function of distinct policy choices made by the FBI, not violations of specific legal standards," and "such policy choices fall squarely within" the exception). The district court thus concluded that the Government was immune from suit under the FTCA.

Second, the district court separately held that the Plaintiffs' claims are barred by the immunity provision in the Brady Act, 18 U.S.C. § 922(t)(6). As the court recognized, this "issue was first raised by the Government in its reply brief, then abandoned at oral argument, and asserted again in post-trial briefs." *Sanders*, 324 F. Supp. 3d at 649. The court deemed this change of positions "distasteful" and "not to be encouraged," *id.* (quoting *United States v. Wheeler*, 886 F.3d 415, 423 (4th Cir. 2018)), but explained that it was "disinclined to find a waiver of congressionally mandated immunity," especially where the Plaintiffs fully briefed the issue and addressed it during the evidentiary hearing, *id.* The court then stated that it was "obvious" that "a claim of negligence in the operation of the

22

NICS system resulting in a prohibited person obtaining a firearm falls plainly within the scope of the Government's immunity." *Id.*

Having dismissed the case for lack of subject-matter jurisdiction, the district court declined to reach the Government's arguments that the Plaintiffs failed to state a claim under South Carolina law. *Id.* at 650.

## II. Standard of Review

The district court dismissed the Plaintiffs' claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) after considering evidence outside the pleadings. In these circumstances, we review the district court's "factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014) (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)).

## III. Analysis

Before this Court, the Plaintiffs argue that the district court committed reversible error in two respects. First, they contend that the district court erred in concluding that the FTCA's discretionary function exception immunizes the Government from this lawsuit. Second, they argue that the court wrongly held that the Brady Act's statutory immunity provision independently bars their claims. We address each contention in turn.

## A. FTCA Immunity

"As a general matter, the United States is immune from suit unless it waives that immunity." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d at 341. The FTCA effects such a waiver of immunity and authorizes certain tort claims against the United States "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *id.* § 2674. That waiver is subject to exceptions, however, and one exception exists for the performance of discretionary functions. This exception immunizes the Government from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a). "FTCA plaintiffs have the burden of showing that the discretionary function exception does not foreclose their claim." *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016). Indeed, the general rule that waivers of sovereign immunity should be strictly construed "is unhelpful in the FTCA context, where unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, which waives the Government's immunity from suit in sweeping language. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (citations and internal quotation marks omitted).

The Plaintiffs argue that the district court erred in concluding that the Government enjoys immunity from suit under the FTCA's discretionary function exception. This inquiry "requires application of a two-step analysis." *Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017). First, we must determine whether the conduct at issue "involves an

24

element of judgment or choice." *Id.* (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "When a statute, regulation, or policy *prescribes* the employee's conduct, the conduct cannot be discretionary and thus is unprotected by the discretionary function exception." *Id.*

If the challenged conduct "is the product of judgment or choice," this Court must then "determine whether the decision made was 'based on considerations of public policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). This second step is intended to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Seaside Farm*, 842 F.3d at 858 (citations and internal quotation marks omitted). "In short, the discretionary function exception . . . shield[s] decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently." *Wood*, 845 F.3d at 128.

Applying this framework, we must analyze the three bases for liability the Plaintiffs assert here: (1) the NICS Examiner's performance of the background check, (2) the FBI's decision to deny Examiners access to N-DEx, and (3) the FBI's failure to maintain data integrity in the NICS Index.

25

## 1. The NICS Background Check

The Plaintiffs contend that the Government cannot pass the first step of the discretionary function test because the NICS Examiner's allegedly negligent performance of the background check did not involve the permissible exercise of policy judgment but rather a prescribed course of action that the Examiner failed to follow. *See Berkovitz*, 486 U.S. at 536–37. The Plaintiffs do not suggest that the Brady Act itself prescribes a mandatory course of action that the Examiner disregarded. Instead, the Plaintiffs contend that the Examiner violated several federal regulations and SOPs that prescribed mandatory research processes that—if followed—would have led to the discovery of Roof's incident report and the subsequent denial of his firearm purchase.

As an initial matter, we agree with the Government that none of the federal regulations at issue prescribes a mandatory directive that was violated such that liability would arise here. The Plaintiffs assert that the NICS Examiner violated a directive in 28 C.F.R. § 25.6(c)(1)(iv)(B), which provides that NICS should issue a Delayed response where "the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law." But the Examiner complied with this regulation and issued a Delayed response upon discovering Roof's arrest record. *See Gaubert*, 499 U.S. at 324 (explaining that the Government will be protected "if a regulation mandates particular conduct[] and the employee obeys the direction"). Nor did the NICS Examiner violate any directive in 28 C.F.R. § 25.6(c)(1)(iv)(C), which provides that NICS will deny a transaction when a search of the NICS Index, NCIC, or III identifies a record containing "information demonstrating

26

that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law." The search of the III database returned a record indicating that Roof had been arrested—not convicted—on a drug charge, but such an arrest record alone does not justify denying a transaction. *See Sanders*, 324 F. Supp. 3d at 645. The Brady Act's implementing regulations thus provide no basis for liability.

The Plaintiffs also argue that the NICS Examiner violated certain mandatory SOPs in conducting Roof's background check. It is true—as the Government emphasizes—that internal operating procedures, guidance manuals, and the like do not automatically give rise to tort liability. *See Holbrook v. United States*, 673 F.3d 341, 347 (4th Cir. 2012) (stating that "[t]he price of circulating internal guidance should not be an exponential increase in exposure to a tort suit").

Nonetheless, there may be circumstances in which internal operating procedures go beyond mere guidance, removing any discretion from the task at hand and articulating a mandatory directive that must be followed at the risk of incurring liability. That is the case here. The NICS SOPs prescribed mandatory directives that the NICS Examiner was required to follow in performing the background check. Because she failed to do so, the discretionary function exception does not insulate the Government from liability. *See Wood*, 845 F.3d at 128 (explaining that the conduct in these instances "is unprotected by the discretionary function exception"); *see also Smith v. Wash. Metro. Area Transit Auth.*, 184 F. App'x 311, 315 (4th Cir. 2006) (unpublished) (finding the discretionary function exception does not apply "where an agency official contravenes internal agency guidelines that impose mandatory duties"); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir.

27

2001) ("[I]nternal guidelines can be an actionable source of a mandatory obligation under the FTCA.").

As the district court stated in its factual findings, which we review only for clear error, the NICS SOPs contain a set of requirements specifying the course of action an Examiner must take in conducting a background check.[4] *See Sanders*, 324 F. Supp. 3d at 643, 647 (describing the SOPs as "rigid" and "highly structured" and explaining that Examiners are "governed by" the SOPs, which "mandate the standards for approval or denial of the firearm sale" and impose "modest requirements"); *see also* J.A. 649 (NICS Examiner responding "yes" when asked whether the SOPs are "mandatory" and "things that you have to follow"); J.A. 932 (Assistant Director of FBI's Criminal Justice Information Services Division in 2015 responding "Yes. We put them in place for that reason" when asked whether SOPs are mandatory); J.A. 1062 (NICS Region Coordinator answering "yes" when asked whether "[y]ou're required to follow" the SOPs). Central to our analysis is SOP 5.5.5, which uses unambiguously mandatory and nondiscretionary language in providing that the Examiner "will contact" the state point of contact ("POC"), the courts, and arresting agencies for incident reports in accordance with the preference on the State Processing Page and Contact List. J.A. 549. The Processing Page further instructs that arresting agencies are the primary contact, in particular for obtaining "police/incident report[s]" like the Roof report. J.A. 491–92. Far from providing mere guidance or

---

[4] At oral argument, counsel for the Government took the position that SOPs can never provide a basis for liability under our decisions in *Seaside Farm*, *Holbrook*, and *Tiffany*. Those cases plainly do not endorse such a remarkable proposition, and we decline to do so today.

information to consider, then, SOP 5.5.5 issues clear directives while removing any discretion from the Examiner.

The NICS Examiner here ultimately failed to comply with the mandatory directives in SOP 5.5.5. After the Lexington County Sheriff's Office informed her in writing—on the first day of the three-day research period—that it had "[n]o arrest or report for this date" and that "Columbia PD will have the Report," the Examiner was required under SOP 5.5.5, and in accordance with the State Processing Page, to contact the Columbia PD as the arresting agency to obtain the report. She did not do so. Instead, the Examiner reviewed the law enforcement agencies in the Lexington County section of the State Contact List and contacted the West Columbia PD. When she learned from the West Columbia PD that "[t]his [was] not a WCPD Arrest" at 8:46 a.m. on the second day of the waiting period, she was then—still—required to contact the Columbia PD to obtain the incident report.[5] At this time, the Examiner knew the West Columbia PD was not the arresting agency, she had the name of the actual arresting agency—the Columbia PD—in front of her, and she had almost two full days left to contact the agency to obtain the Roof incident report, a report that no one disputes would have resulted in a denial of the firearm transaction. The Examiner instead "did nothing more."[6] *Sanders*, 324 F. Supp. 3d at 646.

---

[5] We simply cannot agree with the Government's assertion that the statement "Columbia PD will have the Report" was somehow "cryptic." *See* Resp. Br. 27–28. And as the NICS Region Coordinator testified, Columbia PD is "a big PD. We contacted them all the time." J.A. 1066.

[6] SOP 5.5.5 also instructs NICS Examiners to contact the state POC—here, the South Carolina Law Enforcement Division ("SLED")—for any "clarifications on SC (Continued)

The district court acknowledged that "elect[ing] to do nothing" when the Examiner had before her the name of the arresting agency "may not have met the most minimal standards of common sense or due care"—and was not the most "reasonable and logical procedure"—but the court ultimately concluded that the Examiner violated no agency policy. *Id.* at 647. It reasoned that "the NICS SOPs did not address this potential situation and NICS practice prohibited any general internet search" to retrieve the contact information for the Columbia PD, which appeared only on the Richland (not Lexington) County section of the Contact List. *Id.* The court also explained that the Examiner complied with the SOPs because "the SOPs require the examiners only to send a single automated fax to a law enforcement agency with no expectation or requirement that follow up work be done if the necessary records are not obtained." *Id.*

This reasoning is flawed. First, contrary to the district court's conclusion—and as we have explained—the SOPs require Examiners to contact the arresting agency when researching Delayed transactions. Once the Examiner's inquiry revealed that the Columbia PD was the arresting agency and that it had the report, she was required to contact it. Her decision not to do so involved no permissible exercise of discretion. To be sure, there are undoubtedly cases that arise where an Examiner makes inquiries and receives no response—or receives no response of value—and thus exercises her discretion to set aside

record[s]." J.A. 493 (designating SLED as the POC and providing contact information). The Examiner did not contact SLED, which had the Roof incident report, as part of the background check. However, the Examiner did fax the Solicitor's Office and was awaiting a response. This does not excuse her failure to follow the directive to contact the arresting agency.

30

the research and process other transactions. That is not this case, and therefore we do not suggest today that an Examiner would run afoul of the NICS SOPs and deprive the Government of its immunity based on such a judgment call. We hold only that where an Examiner's mandatory research yields precisely the type of information the SOPs require, she must act on that information.

Second, the district court appears to suggest that the Examiner had no way to find the contact information for the Columbia PD because of the NICS research restrictions. The record indicates otherwise, however, as the following exchange between the Plaintiffs' attorney and the Examiner illustrates:

> Q. All I'm asking you is [whether] the Lexington County Sheriff's Office told you Columbia Police Department will have the report.
>
> A. Yes.
>
> Q. And Columbia is listed on your cities in South Carolina that you had available to you.
>
> A. The city contact list, yeah.
>
> Q. And you didn't look on that?
>
> A. No.
>
> Q. Okay. And had you looked on it, you would have seen that Columbia was in Richland County; is that correct?
>
> A. It states that, yes.
>
> Q. Okay. And so you would have been able to contact the arresting agency had you looked at [the City/County Contact List]; is that correct?
>
> A. I would – if I would have looked at that page, yes.

31

J.A. 698–99. As this exchange demonstrates, when the Examiner learned that the Columbia PD was the arresting agency with the incident report, she could and should have used the resources at her disposal (1) to confirm that Columbia is in Richland County and (2) to find the Columbia PD's contact information on the Richland County list. That the Examiner may have been barred from conducting internet research thus cannot excuse her failure to comply with the SOPs' directive to contact the arresting agency.

In sum, this is not a case where the alleged negligence turns on Governmental action involving the permissible exercise of discretion taken pursuant to a broad delegation of discretion to effectuate the purpose of a statutory scheme. *Cf. Seaside Farm*, 842 F.3d at 859–60 (no FTCA liability for FDA's allegedly negligent decision under the Federal Food, Drug and Cosmetic Act to issue contamination warning for tomatoes to protect public from escalating salmonella outbreak); *Holbrook*, 673 F.3d at 347, 349 (no liability for FAA safety inspector's allegedly negligent decision to issue airworthiness certificate for helicopter where FAA enjoys broad grant of statutory discretion in promoting air safety and the certification process "reserves discretion for [] inspectors to ensure compliance with aviation safety requirements"); *Tiffany*, 931 F.2d at 279 (no liability for Defense Department's alleged negligence for decisions related to an intercept of an unknown aircraft traveling in an air defense zone where "the regulations . . . reserve a great deal of discretion for the parties who must conduct [such] defensive maneuvers"). This case turns instead on the NICS Examiner's alleged negligence in failing to follow a clear directive—contact the arresting agency—contained within the mandatory SOPs. The Government can claim no immunity in these circumstances. *See Berkovitz*, 486 U.S. at 536 ("[I]f the

employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.").

## 2. Access to N-DEx

The Plaintiffs separately argue that the district court erred in holding that the discretionary function exception immunized the Government's decision against providing NICS Examiners with access to N-DEx, the database created after September 11, 2001, to facilitate the sharing of criminal justice information among federal, state, local, and tribal law enforcement agencies. It is undisputed that local law enforcement had submitted copies of the Roof incident report to N-DEx, but the Government chose not to grant NICS Examiners access to the database. *Sanders*, 324 F. Supp. 3d at 647. The district court determined that the Government's decision could not serve as a basis for liability because "the decision to deny the NICS examiners access to the most comprehensive federal database is a policy choice and the FTCA provides the Government immunity for policy choices (even really bad policy choices)." *Id.*

In challenging this conclusion, the Plaintiffs argue that the Government's decision constitutes not a discretionary policy choice but a violation of the mandatory directive in 28 C.F.R. § 25.6(c)(1)(iii), which provides that the NICS Operations Center, upon receiving a request for a background check, will "[s]earch the relevant databases (i.e., NICS Index, NCIC, III) for any matching records." Because N-DEx is a "relevant database," the Plaintiffs contend, the Examiners were required to check it.

We disagree. As the Government points out, the regulation employs the restrictive signal "i.e.," or "that is," an indication that the three databases listed—NICS Index, NCIC,

33

and III—are the exclusive "relevant databases" to be checked rather than mere examples of such databases. *Compare Black's Law Dictionary* 863 (10th ed. 2014) (defining "i.e." as "That is" and contrasting "i.e." with "e.g."), *with id.* at 629 (defining "e.g." as "For example"). Other provisions in the regulations, moreover, confirm that the list of databases is exclusive. *See, e.g.*, 28 C.F.R. § 25.6(c)(1)(iv)(C) (providing that a "Denied" response will be issued when a matching record "is found in either the NICS Index, NCIC, or III"). The Plaintiffs suggest that the omission of the N-DEx from this list makes sense because the database was created after the regulation was promulgated. But as the Government properly notes, 28 C.F.R. Part 25 was amended in 2014, *see National Instant Criminal Background Check System Regulation*, 79 Fed. Reg. 69,047 (Nov. 20, 2014), and the list of relevant databases went unchanged—an indication that the list does not include N-DEx.

The Plaintiffs alternatively contend that the regulation's reference to "NICS Index" actually encompasses N-DEx, but this argument fares no better. The term "NICS Index" is defined as "the database, to be managed by the FBI, containing information provided by Federal and state agencies about persons prohibited under Federal law from receiving or possessing a firearm." 28 C.F.R. § 25.2. Contrary to Plaintiffs' suggestion, this definition makes plain that the NICS Index is "the database" created under the Brady Act that was designed specifically as a repository for information about individuals ineligible to possess a firearm. N-DEx, by contrast, is a different database with a different array of information. The Plaintiffs thus cannot successfully argue that N-DEx forms a part of the NICS Index such that the Examiner violated a mandatory directive in failing to check it.

The district court committed no error in concluding that the Government cannot be held liable under the FTCA for declining to give Examiners access to the N-DEx. This decision—declining to provide access to an investigative database "because [a] review determined a low information return rate at the time and a conflict with purging requirements," J.A. 1436—involved "an element of judgment," and "that judgment is of the kind that the discretionary function exception was designed to shield," *Berkovitz*, 486 U.S. at 536.

### 3. Failure to Maintain Data Integrity

The Plaintiffs finally contend that the Government contravened a mandatory directive by failing to maintain "data integrity" during the NICS background check. *See* 28 C.F.R. § 25.5(a) ("The FBI will be responsible for maintaining data integrity during all NICS operations that are managed and carried out by the FBI."). Specifically, the Plaintiffs argue that the Government violated this directive when it managed and maintained a South Carolina Contact List that included the city of Columbia in Richland County—where most of the city falls—but not in Lexington County as well.

As the Government points out, however, this regulation—entitled "Validation and data integrity of records *in the system*"—relates specifically to records maintained by the FBI in the NICS system. The regulation enumerates four types of responsibilities, and they all deal with ensuring the accuracy, validity, and quality of records in the NICS Index. *See* 28 C.F.R. § 25.5(a). The Plaintiffs offer no support for the proposition that an omission on a state's Contact List—a list that is not part of the NICS Index—would amount to a

violation of 28 C.F.R. § 25.5(a) giving rise to an FTCA claim. For this reason, the Plaintiffs' data-integrity claim has no merit.

## B. Brady Act Immunity

Aside from challenging the district court's FTCA ruling, the Plaintiffs also take issue with the court's conclusion that the immunity provision of the Brady Act, 18 U.S.C. § 922(t)(6), independently bars their claims. *See Sanders*, 324 F. Supp. 3d at 649. As the district court explained, this "issue was first raised by the Government in its reply brief, then abandoned at oral argument, and asserted again in post-trial briefs." *Id.* The court nevertheless addressed the issue because it was "disinclined to find a waiver of congressionally mandated immunity" and because the "[p]laintiffs fully briefed this issue and addressed it at the evidentiary hearing." *Id.* We likewise address the issue, but conclude that the district court erred in construing § 922(t)(6) to bar the Plaintiffs' claims.[7]

> The Brady Act's immunity provision reads as follows:
>
> Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages—
>
> (A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or
>
> (B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

18 U.S.C. § 922(t)(6). By its plain text, this provision grants immunity only to "a local government" or "*an employee* of the Federal Government or of any State or local

---

[7] Both parties—in addition to the Brady Center as amicus curiae—briefed the issue on appeal and addressed it during oral argument.

government." *Id.* (emphasis added); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012) (any question of statutory construction must begin with the text itself). And the immunity provision applies only if an actor is "responsible for providing information to" the NICS system. 18 U.S.C. § 922(t)(6). Both conditions must be met for immunity to take effect. Neither condition is satisfied here.

First, the Plaintiffs sued the Federal Government rather than any federal employee. The statutory text immunizes only "an employee of the Federal Government" from suit, not the Federal Government itself—and the structure of the provision makes this distinction clear. The statute immunizes "an employee of the Federal Government or of any State or local government" in addition to "a local government." That the statute distinguishes between immunity for *employees* at all three levels of government, on the one hand, and immunity for only *local governments*, on the other, strongly indicates that Congress intended to exclude the Federal Government from the grant of immunity. *See Setser v. United States*, 566 U.S. 231, 238–39 (2012) (applying the principle of *expressio unius* to divine congressional intent). As the Brady Center points out, moreover, when Congress seeks to immunize the Federal Government from liability, it knows how to do so. *See, e.g.*, 43 U.S.C. § 1656(b) ("[T]he United States and the several States, and political subdivisions thereof, shall not be liable under this section."). No such grant of immunity exists here.

In concluding to the contrary, the district court did not address the statutory text and reasoned simply that "[t]he Government cannot act other than through its employees." *Sanders*, 324 F. Supp. 3d at 649. As an initial matter, this reasoning renders superfluous some portion of the statutory text, which clearly distinguishes between immunity for local

37

governments and immunity for federal, state, and local governmental employees. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (courts must give effect to every provision of a statute). If federal and local governments enjoyed immunity through their employees, Congress would not have needed to single out "local governments" for immunity in the statute.

The district court's analysis appears to rest on the faulty reasoning that because the Government can assert any defenses of individual federal employees, and because employees like the NICS Examiner can claim immunity under this statute, the Government likewise enjoys immunity under the statute. In defending this reasoning, the Government relies principally on two cases that do not implicate the specific statutory immunity conferred under the Brady Act and deal instead with the defenses the Government may raise under the FTCA. *See Norton v. United States*, 581 F.2d 390, 391–93 (4th Cir. 1978) (holding that the Government, sued under the FTCA for an allegedly unlawful search conducted by its agents, may assert all defenses available to the agents, including good faith and reasonable belief); *Medina v. United States*, 259 F.3d 220, 225 n.2 (4th Cir. 2001) (recognizing this proposition in dicta). That the Government in FTCA cases may assert defenses available to individual agents does not mean that the Government can claim the federal statutory immunity in the Brady Act that Congress specifically granted only to federal employees. In sum, the statutory text is clear: federal employees, but not the Federal Government, enjoy immunity from suit under § 922(t)(6).

Even if the Federal Government could invoke the statutory immunity expressly conferred on federal employees, immunity still would not attach because the second

38

statutory condition is not met: the federal employees whose conduct forms the basis of this suit were not "responsible for providing information" to the NICS system. 18 U.S.C. § 922(t)(6).

The Government argues primarily that the Examiners provide information to the NICS system because, for example, any time an Examiner issues a denial for a firearm transaction she must submit that information to the NICS Index. Contrary to the Government's assertion, the record makes clear that NICS Examiners are responsible for *operating* the NICS Index—through researching information contained in the system—rather than for "providing information" to the system.[8] Indeed, the statutory scheme itself distinguishes between providing information like criminal records to the NICS system (primarily a responsibility of states and localities) and conducting research and performing background checks (a responsibility of NICS Examiners). *Compare* 34 U.S.C. § 40901(a)(1), (b) (providing that the Attorney General "shall establish a national instant criminal background check system," including "determin[ing] . . . the means by which State criminal records systems . . . will communicate with the national system"), *with id.* § 40901(a)(2) (providing that the Attorney General shall "determine for each State a timetable by which the *State should be able to provide criminal records . . . to the national system*" (emphasis added)). That the Examiners may issue firearm denials in the course of their work therefore does not mean they are "responsible for providing information" to the

---

[8] Counsel for the Government in fact stated before the district court that the Plaintiffs "are not making the argument that they're suing the U.S. for failing to put the data into the NICS system." J.A. 1504.

NICS system within the meaning of § 922(t)(6). The Government thus cannot claim immunity for this additional reason.

In conclusion, the immunity provision of the Brady Act does not shield the Government from this lawsuit.

## IV. Conclusion

For the foregoing reasons, we reverse the district court's order granting the Government's motion to dismiss for lack of subject-matter jurisdiction and remand this case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

AGEE, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusion that the district court erred in determining the immunity provision of the Brady Act, 18 U.S.C. § 922(t)(6), bars the Plaintiffs' claims. In addition, I concur in the majority's holdings that the district court did not err in determining the Plaintiffs cannot present claims based on a failure to maintain data integrity or to grant access to the N-DEx, or a claim that the implementing regulations under the Brady Act prescribe a mandatory directive.

I write separately, however, because I respectfully disagree with the majority's conclusion that the National Instant Criminal Background Check System ("NICS") Examiner's actions, insofar as they were guided by the Standard Operating Procedures ("SOPs"), were not shielded by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). Because the SOPs at issue did not mandate how the Examiner was to conduct additional research, and because that research involved "judgment . . . of the kind that the discretionary function exception was designed to shield, *i.e.*, [judgment] based on considerations of public policy," *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009),[1] the Examiner's actions fit within the exception. To find otherwise would effectively render meaningless the protections the exception affords to policy-driven Government decisions and essentially create per se liability on the part of the Government.

---

[1] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

# I.

As the majority notes, a reviewing court must ask two questions before applying the discretionary function exception: First, does the conduct at issue involve an element of judgment or choice? Second, if the conduct does involve such an element, was the decision made based on public policy considerations? If the conduct reviewed meets both requirements, then the discretionary function exception will apply, thereby shielding the Government from FTCA liability. *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988).[2]

The majority concludes that the discretionary function exception does not apply to the way the Examiner conducted the background check because the Examiner violated the SOP governing external research, SOP 5.5.5. This SOP required her to "contact the state [point of contact ('POC')]." J.A. 549. According to the majority, when the Examiner received a response stating that her initial inquiry was to the incorrect state POC, the SOPs required her to confirm the location of the correct POC, go back to her contact list, locate the correct POC's contact information, and contact that POC. *See* Maj. Op. at 30–32.

I disagree that this elongated chain of assumptions negates the discretionary function exception. On the contrary, to the extent that the SOPs mandated the Examiner's conduct, she complied with them. And insofar as they did not direct how she was to conduct additional research once she determined that she had contacted the incorrect state POC, the

---

[2] Further, when the Government asserts that a claim is barred by this exception, the Plaintiffs have the burden of demonstrating that the exception does not apply and that a federal court has subject matter jurisdiction. *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016).

Examiner was afforded discretion in how to pursue any follow-up research. Furthermore, such discretion was grounded in public policy considerations—specifically, the Federal Bureau of Investigation's ("FBI") balancing of the need for effective, efficient background checks against limited agency resources. For these reasons, I conclude that the Examiner's actions were shielded by the discretionary function exception.

## II.

To offer greater context for my disagreement with the majority, I first highlight the most salient aspects of the factual background and the SOPs at issue. *Cf.* Maj. Op. at 16–19.

In March 2015, Dylann Roof was charged with an offense sufficient to disqualify him from possessing a firearm under 18 U.S.C. § 922(g)(3). However, jurisdictional issues complicated the accuracy of the records related to that charge: on February 28 of that year, a police officer with the Police Department for the City of Columbia, South Carolina (the "Columbia PD"), had arrested Roof at the Columbiana Centre Shopping Mall for illegal possession of Suboxone, a Schedule III controlled substance. The Mall lies within the city limits of Columbia, in a portion of the City that falls in Lexington County, South Carolina. Although that portion of the City is in Lexington County, the majority of Columbia is located within adjacent Richland County. Accordingly, the Columbia PD has jurisdiction over the Mall (as does the Columbia Municipal Court), but the Lexington County Sheriff's Office (the "LCSO") processes arrests arising from the Mall and the 11th Circuit Solicitor's

43

Office (which has jurisdiction over Lexington County) prosecutes cases arising from those arrests.

After the Columbia PD officer arrested Roof, he was booked that day at the LCSO. The next day, March 1, the officer applied for an arrest warrant with the Columbia Municipal Court, which issued that same day (stating the offense occurred within the "Municipality of [the] City of Columbia," J.A. 331). Roof was served with the warrant on March 2.[3] Later that month, the 11th Circuit Solicitor's Office filed a criminal complaint against Roof, charging him with the offense of simple possession of a Schedule III controlled substance without a prescription, in violation of S.C. Code § 44-53-370(c), for which the first offense is a misdemeanor, S.C. Code § 44-53-370(d)(2). *See Sanders v. United States*, 324 F. Supp. 3d 636, 642 (D.S.C. 2018).

On April 11, while the charge was still pending, Roof sought to purchase a firearm at a federally licensed firearms dealer in West Columbia, South Carolina.[4] The dealer contacted the NICS to run the mandated criminal background check. Following a review of internal databases, an NICS representative found information on the Interstate Identification Index (the "III") indicating Roof had been arrested by the LCSO. Specifically, the results provided:

> Arresting Agency[:] LEXINGTON CNTY SO
> . . .
> Charge[:] MDP, SCH I B,C,LSD AND SCH II,[ ]COCAINE 3RD/SUB
> Statute[:] (44–53–370(B)(1) SC)

---

[3] Both the Columbia PD and the LCSO submitted an incident report regarding the arrest to the N-DEx. However, as the majority notes, the Examiner did not have access to the N-DEx. *See* Maj. Op. at 19.

[4] West Columbia is a separate city from Columbia.

44

Severity[:] Felony

J.A. 450. However, these results included two significant clerical errors made by the LCSO when it submitted the information to the III. First, the results misidentified the class of the crime, identifying it as a felony charge for a third or subsequent offense for distributing or manufacturing a Schedule I or II narcotic in violation of S.C. Code § 44-53-370(b)(1)— not the misdemeanor possession offense for which Roof was actually arrested and charged under S.C. Code § 44-53-370(d)(2). Second, the results named the arresting agency as the LCSO, not the Columbia PD. Regardless, because of the potential disqualifiers arising from these results, the representative transferred the file to another NICS section, which placed the transaction in the NICS Delay Queue for further research.[5]

The next business day, April 13, the NICS Examiner pulled the transaction from the Delay Queue. Pursuant to SOPs 5.0 (Processing Delay Queue Transactions) and 5.5.4 (In-House Research), the Examiner first checked the internal databases but found no information beyond what was reported in the III. This information indicated two potential federal prohibitors barring transfer of the firearm to Roof: (1) as the result of the incorrectly-listed felony charge, a conviction "in any court of[ ] a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1); *see also* 18 U.S.C.

---

[5] Specifically, that NICS section confirmed the III result matched Roof's identifying information and placed the transaction in "delayed" status, thereafter informing the dealer that Roof could receive the firearm on April 16 unless otherwise notified by the NICS before then.

§ 922(d)(1) (prohibiting the transfer of a firearm to such an individual);[6] and (2) "unlawful use[] of or addict[ion] to any controlled substance," 18 U.S.C. § 922(g)(3); *see also* 18 U.S.C. § 922(d)(3) (prohibiting the transfer of a firearm to such an individual). J.A. 703–04. As the Examiner explained, "I kn[e]w the prohibitor was 1 or 3. It was federal—for a felony conviction or for Federal Prohibitor 3, the drugs." J.A. 703–04; *see also* J.A. 1301 (N-DEx supervisor explaining that his "understanding" of the "two potential prohibitors" was that Roof "could have been convicted of a felony since the arrest" or "the underlying facts of the arrest could show [Roof] to be an unlawful drug user or addict"); J.A. 1418 (noting that "[a]fter reviewing the record, the Examiner identified two potential federal prohibitors," either "a felony arrest" under § 922(g)(1) or a "drug violation[]" under § 922(g)(3)).

A number of SOPs guided the NICS Examiner's research of these prohibitors. With respect to the first potential disqualifier, SOP 5.5.3 (Missing Disposition) provided that an examiner "must obtain information to determine if the receipt of a firearm would violate state or federal law." J.A. 490. Such information could come in the form of (1) a final disposition (that is, a "sentencing or other final statement of a criminal case") or (2) in the case of a missing or delayed disposition, a dated indictment or information for a felony offense. J.A. 490 (emphasis omitted).

---

[6] A felony *indictment* also bars sale of a firearm to an individual. Under § 922(d)(1), "It shall be unlawful for any person to sell . . . any firearm . . . to any person knowing or having reasonable cause to believe that such person . . . is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[.]" 18 U.S.C. § 922(d)(1); *see also* J.A. 108 (Plaintiffs noting that an individual "under indictment for a felony crime punishable by imprisonment for a term exceeding one year . . . could not legally be sold a gun under the Brady Act, 18 U.S.C.A. § 922(d)(1)").

Alternatively, with respect to the second potential prohibitor, SOP 5.4.7 (Controlled Substance (Federal Prohibitor § 922(g)(3)) provided that for possession to be a disqualifier under § 922(g)(3), an examiner may make "[a]n inference of current use" through "evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time." J.A. 430.[7] For controlled substance arrests within the past year without a conviction—as was the case here—the arrest was enough to "establish [an] inference of current or recent drug use or possession," if one of two criteria was met. J.A. 431. First, "[i]f there has been a drug arrest in the past year, without a conviction," an examiner "must determine if it can be proven that the individual, or the substance in his/her possession, tested positive for a controlled substance that has no federally accepted medical use[.]" J.A. 431 (emphases omitted). SOP 5.4.7 further noted that the NICS "will only accept the material is a controlled substance once proven by a field or chemical test" and will not accept "the officer's opinion that the material is a controlled substance." J.A. 431. Second, it was also "enough to establish recent use/possession" if "an individual admits to using or possessing a controlled substance which has no federally accepted medical use." J.A. 431 (emphasis omitted). In sum, to establish an inference of current use, the SOPs directed the Examiner to obtain additional information, most likely contained within the "incident report or other documentation"

---

[7] Such evidence may include (1) "a conviction for use or possession of a controlled substance within the past year," (2) "multiple arrests for such offenses within the past five years with the most recent arrest occurr[ing] within the past year," or (3) "persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year." J.A. 430.

47

underlying the arrest. J.A. 431; *see also Sanders*, 324 F. Supp. 3d at 645 (noting that "the examiner [was required] to obtain further details about the Roof arrest, which were contained in the arresting officer's incident report").

To conduct such outside research, the Examiner was guided at the broadest level by SOP 5.5.5 (External Research), which provided:

> The Examiner *will contact the state POC, the courts, district attorneys, probation offices, arresting agencies, etc.* for *disposition, level of offense, incident report, etc.* via fax, phone, mail, email, and/or Nlets *in accordance with the preference indicated on the State Processing Page and Contact List.* If the preference indicates that other agencies can only be contacted if no response is received, or as a last resort, other agencies must be contacted, as soon as possible after the 10th calendar day. This will ensure that all resources, in keeping with the NICS Standard Operating Procedures and established state contact procedures, are being exhausted. *Every effort must be made to obtain the necessary information, in order to reach a final decision on a NICS transaction during the research phase.*

J.A. 549 (emphases added).

In turn, the South Carolina Processing Page (the "Page") noted that "[c]ourts and arresting agencies are the primary contact (follow Contact List)," while also providing: "During Initial Research Please Contact ALL Available Agencies Per Contact List." J.A. 491. The Page then listed the various agencies that were to be contacted for different types of information, noting that the arresting agency—whether the sheriff's office or the police department—is the primary "[c]ontact for police/incident report[s], lab report[s], and disposition information unless otherwise noted on contact list." J.A. 492.[8] In turn, the specific contact list for Lexington County included the LCSO—the named arresting agency

---

[8] The Page also listed courts for disposition information, as well as solicitor's offices. J.A. 491–92.

in the III—with a bolded fax number indicating a preference for fax inquiries. J.A. 496. That contact list also included the 11th Circuit Solicitor's Office, with a similarly-bolded fax number. J.A. 497.

To begin her research, the Examiner first checked internal NICS databases but did not discover any additional information. She then began her external research by checking the Lexington County General Sessions Court's website, where she located a pending charge against Roof for "Drugs / Poss. of other controlled sub. in Sched. I to V—1st offense," a misdemeanor. J.A. 521. The website did *not* name the arresting agency, but did name the officer who had arrested Roof (without identifying he was an officer with the Columbia PD) and the address (but *not* the name) of the Columbia PD. *See* J.A. 522. Although these records indicated Roof might be disqualified from a firearm purchase as a drug user, they were insufficient under either SOP 5.5.3 or 5.4.7 to establish disqualification.[9] As explained previously, when there is a potential felony offense, SOP 5.5.3 requires an information or indictment to establish disqualification. Alternatively, when there has been a recent controlled substance arrest without a conviction, SOP 5.4.7 requires either (1) proof that the substance was tested and confirmed to be a controlled substance or (2) that the arrestee admitted possession of a controlled substance. *See Sanders*, 324 F. Supp. 3d at 645.

---

[9] Although the offense identified on the General Sessions Court website was a misdemeanor, SOP 5.0 (Processing Delay Queue Transactions) provides that "[i]f the record contains a potential disqualifier, further research is required." J.A. 473. Accordingly, the Examiner was not incorrect to pursue a potential disqualifier based on § 922(d)(1) or (g)(1). As noted above, she understood there to be two potential disqualifiers requiring additional research.

That same day, April 13, the Examiner generated a Form R-84 Final Disposition Report and sent it via automated fax to the LCSO. "The Examiner listed information [the] NICS required on the R-84, including an incident report, whether the drugs were field tested, and if Roof admitted to using drugs." J.A. 1419. The Examiner also sent an automated fax to the 11th Circuit Solicitor's Office in order to determine if Roof was under felony indictment. The LCSO responded that day: "No [a]rrest or [r]eport for this date. The last [a]rrest was on 2-28-15, Columbia PD will have the [r]eport." J.A. 583. The 11th Circuit Solicitor's Office never responded to the fax.

The Examiner then reviewed a list in the NICS database of all law enforcement agencies operating in Lexington County, from which the City of Columbia was erroneously omitted. After reviewing the list, she observed the City of West Columbia was in Lexington County, "the same county" where the request from the firearms dealer had originated. J.A. 1423; *see also* J.A. 1224; 1417. That same day, the Examiner faxed the West Columbia Police Department in an effort to locate the incident report.[10] On the morning of April 14, West Columbia responded, "Not WCPD warrant. This is not a WCPD arrest." *Sanders*, 324 F. Supp. 3d at 646. After receiving that response, the Examiner did not further attempt to locate the Columbia PD. She instead proceeded to process other inquiries while awaiting a response from the 11th Circuit Solicitor's Office, during which time the waiting period elapsed and the dealer exercised its discretion to transfer the firearm. Roof purchased the firearm on April 16 and used it during the June 2015 shooting.

_____

[10] The contact list did not indicate a preference for contact by phone or fax.

III.

A.

I turn now to the first question posed by the discretionary function exception test: did the conduct at issue involve an element of judgment or choice? The exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because there "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. But "[i]n the absence of an expressly articulated standard to limit" discretion, "it is impossible to find that the Government's decisions [are] anything but purely discretionary." *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 970 (4th Cir. 1992).

Bearing this standard in mind, I first conclude the Examiner complied with any aspects of the relevant SOPs that were mandatory. Second, to the extent she needed to perform additional research, the SOPs afforded her discretion in how to do so. Finally, we have cautioned against finding that "select passages from a lengthy and complex" set of agency guidelines impose mandatory directives, particularly where such an interpretation of the guidelines "would elevate rigidity over flexibility" and "handicap efficient government operations." *Holbrook v. United States*, 673 F.3d 341, 347 (4th Cir. 2012).

1.

First, the Examiner complied with the conduct deemed mandatory by the SOPs, including 5.4.7, 5.5.3, 5.5.5, and the South Carolina Processing Page. Accordingly, the Government cannot be liable here. *See Gaubert*, 499 U.S. at 324 ("[I]f a [Government

51

directive] mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the [directive].").

Specifically, to disqualify Roof from purchasing a firearm under § 922(d)(1) or (g)(1), SOP 5.5.3 required the Examiner to obtain a felony indictment or information. Alternatively, to disqualify Roof from purchasing a firearm under § 922(g)(3), SOP 5.4.7 required either Roof's admission of drug use or testing confirming a controlled substance, either of which could have been contained in the incident report. To obtain either the indictment or incident report, SOP 5.5.5 mandated that the Examiner "contact the state POC . . . for disposition, level of offense, incident report, etc. . . . in accordance with the preference indicated on the State Processing Page and Contact List." J.A. 549.

The Examiner noted that the Processing Page listed the arresting agency as the primary contact for incident and lab reports. Alternatively, the Examiner "knew from the website that the case was pending" and would not have a disposition, but that the 11th Circuit Solicitor's Office—rather than the Lexington County General Sessions Court— would be able to tell her if Roof was "under . . . felony indictment." J.A. 544–45; *see also* J.A. 491 (South Carolina Processing Page noting the courts are the primary contact for the "Record of Conviction" or "Disposition Sheet," which the Examiner was not seeking). In sum, the SOPs required the Examiner to contact the LCSO—the (incorrect but listed) arresting agency—for the incident report and the 11th Circuit Solicitor's Office for the indictment.

This is precisely what the Examiner did. As she summarized:

52

> I went to the agencies that [were] listed per the processing page, what those agencies had. [P]er the processing [page], you obtain your incident reports from the sheriff's office, which I did contact. The solicitor has indictment information. You check for firearm restrictions, drug testing from the solicitor, which I contacted. Possible indictments, that's why I contacted them. Because I knew the case was pending, I knew it [had] not [gone] to trial per the website, so that is why I went to those agencies for that information.

J.A. 704. Thus, with respect to the potential § 922(g)(3) prohibitor, although the Examiner failed to contact the actual arresting agency, she *did* contact the arresting agency identified by the NICS database, the LCSO, for the incident report. As the Government correctly noted, "The Examiner violated no clear and mandatory duty by acting on the basis of information provided by local law enforcement." Resp. Br. at 27. And insofar as she was required to contact the 11th Circuit Solicitor's Office to research the § 922(d)(1) or (g)(1) prohibitor, she did. Put simply, the Examiner did not violate SOP 5.5.5's directive to "contact the state POC . . . in accordance with the preference indicated on the State Processing Page" for the necessary information. J.A. 549.

2.

Second, although the above-listed SOPs and the Processing Page dictated how the Examiner was to begin the background check—in this instance, by contacting the arresting agency for an incident report and the Solicitor's Office for the indictment—the SOPs did not dictate how she was to continue with her research after the initial contact. After the Examiner received a fax response from the LCSO indicating that agency did not have the requested report but that the Columbia PD would, she continued her search. Drawing from the fact that Lexington County "was the actual county that was listed on [Roof's] record," J.A.

53

538, the response from the LCSO, and her experience as a researcher, she could reasonably assume that the LCSO was referring her to another police department within Lexington County. As she testified, "[A] lot of [the] time the agencies . . . don't write a lot of information . . . they didn't tell me that it was in a different county. They just wrote 'Columbia.'" J.A. 538–39. Accordingly, she reviewed the list of police departments and sheriff's offices in Lexington County and located the West Columbia PD, the same city where the firearms dealer's request originated: "So by my contact list, I went to West Columbia PD because that was the closest thing that I had in that county." J.A. 539. She explained, "I didn't have any reason to go to any other county." J.A. 543.

Furthermore, she also knew she had conducted additional research into a separate potential prohibitor when she had faxed the 11th Circuit Solicitor's Office. Accordingly, when the West Columbia PD responded that Roof's arrest was "not a WCPD [one]," *Sanders*, 324 F. Supp. 3d at 646, she instead "left the Roof inquiry in the Delayed Queue and processed other inquiries while awaiting a response" from the 11th Circuit Solicitor's Office as to the other potential prohibitor—a point the majority ignores. J.A. 1419.

But even if the Examiner were not researching another potential prohibitor and were instead awaiting any general response from the Solicitor's Office, she violated no SOPs by choosing to pause her research in the interim. She could do so because, as the district court correctly recognized, "the NICS SOPs did not address this potential situation and NICS practice" generally prohibited follow-up contact or external Internet research. *Sanders*, 324 F. Supp. 3d at 647. Put another way, there was nothing more that the SOPs required the Examiner to do. Indeed,

54

> [a]t this point in the process, the Examiner had 'Exhausted all Means' [per SOP 5.15] as all possible agencies were contacted as outlined in the state-specific list maintained by NICS, and all database searches were conducted as defined by NICS SOPs. Since court records revealed no convictions and contacted agencies provided no definitive clarifying information or did not respond, the Examiner left the Roof inquiry in the Delayed Queue and processed other inquiries while awaiting a response from the Lexington County Solicitor's Office.

J.A. 1419 (footnote omitted). At bottom, the SOPs afforded the Examiner the discretion to pause the research until she received further information.

The majority contends this reasoning is flawed because (1) "the SOPs require[d] [the] Examiner[ ] to contact the arresting agency when researching Delayed transactions" and "[o]nce the Examiner's inquiry revealed that the Columbia PD was the arresting agency and that it had the report, she was required to contact it"; and (2) the Examiner was directed to "use[ ] the resources at her disposal . . . to confirm that Columbia is in Richland County and . . . to find the Columbia PD's contact information on the Richland County list." Maj. Op. at 30–32. But in none of these statements can the majority point to a specific SOP or language mandating the course they project. With respect to SOP 5.5.5, the Examiner *did* contact one of the required POCs—the listed arresting agency—and then contacted another potential arresting agency that she found after reasonably assuming the arresting agencies to be within the same county. Nothing on the Page indicated to the contrary. Furthermore, given that the Examiner also (though erroneously) believed there was another potential prohibitor under § 922(d)(1) or (g)(1), she had faxed the relevant point of contact with respect to that potential disqualifier. Therefore, even after she had received the negative response from the West Columbia PD, she still had an outstanding inquiry with another

55

state POC. Thus, although the majority opines that this is not the type of case "where an Examiner makes inquiries and receives no response—or receives no response of value— and thus exercises her discretion to set aside the research and process other transactions," Maj. Op. at 30, this case in fact fits comfortably within that categorization. Given that the Examiner *had* made contact with two alternative state POCs in accordance with SOP 5.5.5 and had received conflicting and negative responses from one set (the arresting agencies), and had not received a response from the other (the Solicitor's Office), she acted well within her discretion to process other transactions while awaiting a response.

Furthermore, to the extent the majority and the Plaintiffs would look to additional language in SOP 5.5.5 as mandating follow-up research, that language is too broad to carry that load. Specifically, the majority concludes that SOP 5.5.5 required that the Examiner use all of the available resources at her disposal to contact the actual, but not listed, arresting agency, such as by contacting the South Carolina Law Enforcement Division ("SLED") for clarification or by examining the city contact list and searching for the Columbia PD. The Plaintiffs, citing SOP 5.5.5, similarly contend that the Examiner violated the SOP by failing to "make every effort to obtain the information needed to reach a final decision," such as contacting SLED or the Lexington County General Sessions Court or calling the LCSO or West Columbia Police Department for clarification. *See* Opening Br. at 10, 13, 23. As this Court has previously recognized, however, such language is too broad to confer a mandatory course of action removing discretion but instead shows an exercise of discretion to choose among numerous options. *See Baum v. United States*, 986 F.2d 716, 722 (4th Cir. 1993) (noting that "very general, sweeping language is insufficient" to impose a mandatory

56

directive). Indeed, by suggesting multiple courses of action that the Examiner could have taken, the majority and the Plaintiffs verify that there was room for the exercise of the Examiner's judgment in how to proceed. In other words, hers was a discretionary choice.

In addition, it was NICS practice at the time to refrain from contacting state entities by phone, sending follow-up faxes, or conducting external Internet-based research. *See Sanders*, 324 F. Supp. 3d at 646–47; *see also* J.A. 1429. As the FBI noted, "[d]ue to NICS Section SOP and workloads, Examiners do not routinely call external agencies for information." J.A. 1429. Furthermore, "many external agencies require[d] fax requests." J.A. 1429. Similarly, NICS Management had eliminated a second/follow-up fax requirement because "the majority did not contribute to the resolution of an 'open' transaction" and because the requirement had "experienced up to an approximate 85 percent failure rate." J.A. 1603. Finally, testimony from NICS managers showed that web searches were not encouraged because their results were generally unreliable. *See* J.A. 426–27 ("The employees are asked to use the processing page and contact pages that we have that have been validated [rather than an Internet search engine]. That information is information that has been validated by a law enforcement agency.").

Other SOPs and NICS protocols underscore the discretion afforded to the Examiner in how to continue the background check. First, SOP 5.15 provided that when examiners researched all available resources for information, "the following [was to] be entered into the transaction[:] All resources identified after reasonable research have been exhausted[.]" J.A. 1419. Thus, this SOP required only "*reasonable* research"—and, like the similarly broad

"every effort" language, it cannot be viewed as imposing a mandatory course of action. *See Baum*, 986 F.2d at 722.

Second, the SOPs also indicated, contrary to the majority and the Plaintiffs' view, that the Examiner was not required to resolve her research within three days. *See* Opening Br. at 7, 23–24. The Plaintiffs argue the Examiner violated SOP 5.0, which states "[i]t is the responsibility of the NICS Section to answer all Delayed transactions within the three-business-day time frame." J.A. 476. According to the Plaintiffs, this timeline imposed upon the Examiner a responsibility to pursue all possible leads within that three-day period. But SOP 5.0 cannot be read to have imposed a mandatory course of action on the Examiner because FBI regulations and NICS SOPs themselves contemplated that some transactions would take longer than three days to resolve. *See* 28 C.F.R. § 25.2 (explaining that an "open" transaction is one in which the NICS continues researching potentially prohibiting records even after three business days have elapsed); SOP 5.16 (concerning the processing of expired transactions). The language of SOP 5.5.5 itself confirmed this reading by providing that "[i]f the [processing page] preference indicates that other agencies can only be contacted if no response is received, or as a last resort, other agencies must be contacted, as soon as possible after the 10th calendar day." J.A. 549.[11] Thus, SOP 5.5.5 contemplated that research could take longer than three days to resolve.

---

[11] To the extent the Solicitor's Office was listed as such a "last resort" contact on the South Carolina Processing Page, the Examiner complied with this directive by contacting them well within the ten-day timeframe.

Along this line, NICS protocol at the time indicated that if an examiner was unable to resolve a delayed transaction within three business days, it remained "Open" for the remainder of a thirty-day period, permitting other examiners to access the inquiry if new information became available. J.A. 1416. After thirty days, it became "Expired," allowing any other examiner to act on it. J.A. 1416. Thus, NICS practice specifically assumed some transactions "would remain in Delay status indefinitely or until [they were] purged per statute from the NICS system." J.A. 1419.[12]

In sum: because the court records revealed no convictions and the contacted agencies provided no verified information, it was within the Examiner's discretion to leave the Roof inquiry in the Delay Queue and process other inquiries while awaiting a response from the Solicitor's Office. Altogether, as the district court summarized, the SOPs required little of the Examiner, mandating only that she "send a single automated fax to a law enforcement agency with no expectation or requirement that follow up work be done if the necessary records [were] not obtained." *Sanders*, 324 F. Supp. 3d at 647. On this record, it cannot be said that the Examiner violated a mandatory duty.

3.

---

[12] Similarly, SOP 5.16 specifically provided that if an examiner encountered an expired transaction regarding a purchaser he or she was currently researching, that examiner had the responsibility to determine if a final status could be applied to that expired transaction. That SOP also provided that NICS supervisors could assign a backlog of expired transactions for processing "when the delay queue [was] at a manageable level and time [was] permitted to work on special projects." J.A. 477. Thus, these SOPs and protocols further indicate that NICS examiners had room to decide how to continue a background check—including by leaving it "Open."

Finally, I conclude this portion of the analysis by making three general observations regarding the nature of the discretionary function exception. First, to the extent that the SOPs at issue contained overlapping or conflicting directives, such instructions should be viewed as "expand[ing], rather than contract[ing] the discretion" afforded to the Examiner. *Holbrook*, 673 F.3d at 347. In *Holbrook*, this Court considered the Federal Aviation Administration's ("FAA") decision to suspend the airworthiness certification of a helicopter that had been leased by the owner of a flight instruction business. The owner sued the FAA pursuant to the FTCA, claiming monetary loss to his business as the result of the suspension of the certification. In particular, the owner asserted that the certification should never have been revoked because the FAA inspector had assessed the aircraft under the wrong Code of Federal Regulations ("CFR") provision.

Nonetheless, this Court concluded that the FAA's establishment of internal procedures governing certification (including which CFR provision to apply) plainly afforded the inspector discretion in part because "the guidance [was] conflicting at best." *Id.* As the FAA internal procedures provided conflicting or overlapping advice concerning the appropriate CFR provision to apply, such guidance expanded, rather than limited, the inspector's discretion in choosing among which agency instructions to follow. And similarly here, to the extent that the SOPs failed to provide guidance for the particular situation the Examiner faced, or provided conflicting or overlapping instructions (such as the appropriate agency to contact for certain records, or the timeline within which the Examiner was to complete her inquiry), the nature of these instructions should be viewed as expanding the Examiner's discretion.

60

Second, the majority views the SOPs at issue too narrowly, excising them from the broader regulatory and guidance scheme. Although the majority points to the directing language in SOP 5.5.5 as removing the Examiner's discretion, the inclusion of some mandatory language in a regulation or SOP does not automatically mean the action at issue falls outside the scope of the discretionary function exception. After all, "[i]t would be the rare guidance manual that did not contain some arguably mandatory language." *Seaside Farm*, 842 F.3d at 859; *see also Indem. Ins. Co.*, 569 F.3d at 180 (finding the challenged conduct discretionary despite the presence of some mandatory language). Rather, because this Court's "duty [is] to construe the nature of the statutory and regulatory regime as a whole," a highly-structured SOP does not automatically mean the SOP imposes a mandatory course of action. *Seaside Farm*, 842 F.3d at 859. As the Supreme Court noted in *Berkovitz*, many such structured regulations and SOPs may still require a determination of whether agency action involved an element of discretion. *See* 486 U.S. at 545–46. And where such discretion is afforded to Government actors—as here—a determination of "[w]hether the agency pursued its investigation, interpreted relevant evidence, or balanced policy considerations in what [the challenger] believes to be an optimal manner" essentially amounts to "judicial second guessing," which "the discretionary function exception forbids." *Seaside Farm*, 842 F.3d at 858–60; *see also Holbrook*, 673 F.3d at 348 (noting that a court considering whether the exception applies must consider "the broader goals sought to be achieved" and whether such goals "necessarily involve an element of discretion").

Third, as we noted in *Holbrook*, we must proceed cautiously when seeking to impose liability on the Government for attempting to provide guidance to its agents in areas that

require lengthy and complex instructions. *See* 673 F.3d at 346–48. If we were to find the discretionary function exception does not apply in this situation—where the Examiner acted in accordance with the directives given to her by the FBI—this would effectively subject the Government to per se liability for every act of negligence by a Government actor, even when they attempt to comply with agency directives. Such de facto guaranteed insurance is not consistent with the discretionary function exception to the FTCA.

Recall that *Holbrook* warned that the "price of circulating internal guidance should not be an exponential increase in exposure to a tort suit" because "[i]f select passages from a lengthy and complex order could serve as the basis for government tort liability, [agencies] would be hobbled by the specter of litigation" as they worked to pursue their Congressionally-delegated mandates. *Id.* at 347. Although I agree with the majority that the Government wrongly contended that internal guidance can *never* give rise to Government liability under the FTCA, *see* Maj. Op. at 28 n.4, we must also heed the warning of our established precedent that an agency's attempts to provide uniform and efficient services through the promulgation of internal guidance should only rarely give rise to liability, particularly when the cost would be hindrance to the agency's objectives. *See Tiffany v. United States*, 931 F.2d 271, 279–81 (4th Cir. 1991) (rejecting the idea that an "Air Force regulation that designates internal operating procedures automatically gives rise to an actionable duty in tort to comply with them" and recognizing that an agency "might well respond by setting fewer procedures and regulations if each could give rise to civilian tort suits," resulting "in increased confusion and a loss of military efficiency").

Furthermore, imposing liability here could hamstring the proper delivery of a Government service in a key area of public safety. If, for example, the NICS were to respond by issuing an SOP requiring an examiner to follow up on every potential lead she received as the result of contact with the appropriate SOPs, the effect would be a decrease in agency efficiency because examiners would be tied up in pursuing various leads—particularly given the patchwork nature of information from databases and other sources to which examiners have access. Any attempts to improve the efficiency and efficacy of firearms background checks should be focused on improving examiners' access to accurate information. The majority's approach instead hampers examiners by requiring them to follow up on every potential lead and expend further precious resources. *See infra* Section III.B.

In sum, because "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion," *Holbrook*, 673 F.3d at 348, we should conclude that the first step of the discretionary function inquiry has been met. After all, the discretionary function exception is designed to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

## B.

With respect to the second step—whether the exercise of the judgment was grounded in public policy considerations—the NICS Examiner's actions clearly met this

requirement. In concluding so, "we must determine whether that judgment is of the kind that the discretionary function exception was designed to shield, *i.e.*, whether the challenged action is based on considerations of public policy." *Indem. Ins. Co.*, 569 F.3d at 180. "Critical to proper analysis, this inquiry focuses not on the agent's subjective intent in exercising the discretion," but rather "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* And here, the background check is susceptible to policy analysis because—even though examiners may not themselves engage in policymaking—decisions regarding how a background check is conducted are ultimately public policy questions.

More specifically, the question of whether an examiner should keep pursuing an investigation or process other transactions while awaiting responses is fundamentally grounded in the question of how to most effectively utilize limited agency resources. The regulations and SOPs guiding the checks arise from the need to determine how to most efficiently allocate limited resources to conduct over eight million background checks each year, *see* J.A. 1416—a quintessential policy judgment. *See Varig Airlines*, 467 U.S. at 820 (noting the "policy judgments" at issue in that case involved the "the efficient allocation of agency resources"); *see also Holbrook*, 673 F.3d at 345 (noting the discretionary function exception was designed to protect the Government "from liability that would seriously handicap efficient government operations"). And in doing so, the FBI must make further policy judgments about the amount of evidence needed to deny a transaction and how to

manage cooperative efforts with external state and local agencies from whom such evidence is often obtained.[13]

Thus, how the SOPs guide NICS examiners is a question inherently bound up in considerations of economic and political policy—the type of considerations Congress intended to insulate from judicial second-guessing. For these reasons, the Examiner's conduct fulfills the second step of the discretionary function inquiry. Accordingly, I would conclude that the Plaintiffs have failed to carry their burden of demonstrating that the discretionary function exception does not apply.

## IV.

For the reasons discussed, I respectfully dissent from the majority's decision to reverse and remand the Plaintiffs' FTCA claim with respect to whether the discretionary function exception applies to the SOPs. At bottom, the result will effectively diminish the protections that the discretionary function exception was designed to afford to policy-driven Government decisions. I would instead find that the discretionary function

---

[13] This point is well illustrated by NICS Management's decision in 2006 to eliminate, as discussed above, a requirement that examiners send follow-up faxes. Specifically, as part of a process to streamline background checks, the FBI assessed "the amount of time expended in processing the follow-up/second requests versus the number of such responses received as a result of follow-up efforts[.]" J.A. 1603. After concluding that (1) most second faxes did not receive a response or contribute to the resolution of a background check but instead "utilize[d] valuable time that could otherwise be expended to more efficiently and effectively provide resolution to other delayed transactions" and (2) external state and local agencies complained that the second fax requests contributed to delays in responding to initial requests, NICS eliminated the second fax requirement. J.A. 1604.

exception shields the Examiner's actions insofar as they were guided by the SOPs and affirm the district court's decision in this regard. I concur in the majority's opinion in all other respects.